No. 20-16774

---

**United States Court of Appeals
for the Ninth Circuit**

_____

MOHAMED SABRA and COUNCIL ON AMERICAN-ISLAMIC RELATIONS OF ARIZONA,

*Plaintiff-Appellants*,

v.

MARICOPA COUNTY COMMUNITY COLLEGE DISTRICT and NICHOLAS DAMASK,

*Defendant-Appellees.*

_____

**On Appeal from the United States District Court for the District of Arizona, Phoenix Cause No. 20-cv-01080-SMB**

---

**DEFENDANT-APPELLEE MCCCD'S ANSWERING BRIEF**

---

David D. Garner
Travis C. Hunt
OSBORN MALEDON, P.A.
2929 N. Central Avenue, Suite 2100
Phoenix, Arizona 85012
(602) 640-9000
dgarner@omlaw.com
thunt@omlaw.com

**Attorneys for Defendant-Appellee
Maricopa County Community College District**

1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... 5

INTRODUCTION .......................................................................10

JURISDICTION ........................................................................12

ISSUES PRESENTED...................................................................12

STATEMENT OF THE FACTS AND CASE.......................................14

    A.    The Parties. ...............................................................14

    B.    The World Politics Course. ..........................................15

    C.    The Islamic Terrorism Module. .....................................16

    D.    Mr. Sabra is offended..................................................20

    E.    Dr. Damask's discussions with Mr. Sabra. .....................20

    F.    Mr. Sabra's appeal to social media.................................22

    G.    Response to social media backlash..................................22

    H.    Mr. Sabra completes the course and files suit..................23

    I.    The Complaint. .........................................................23

    J.    The Motion to Dismiss................................................25

    K.    Oral Argument...........................................................25

    L.    The district court dismisses Appellants' claims.................27

SUMMARY OF ARGUMENT .......................................................28

ARGUMENT ...........................................................................30

I.    Principles of academic freedom underly each of MCCCD's
arguments. ...............................................................30

II.   The district court correctly dismissed CAIR-AZ's claims for lack of organizational standing. ..............................................................32

    A.   Standard of review and legal standard...............................32

    B.   CAIR-AZ lacks standing under Establishment Clause jurisprudence. ...............................................................33

    C.   *Havens* has never conferred standing on organizations asserting Establishment Clause or Free Exercise claims....................34

    D.   *Havens* expressly excludes organizational standing in circumstances applicable to CAIR-AZ.............................36

        1.   *Havens* does not permit standing based on a setback to CAIR-AZ's abstract societal interests. .....................36

        2.   CAIR-AZ did not "divert" its resources; it simply spent resources on preferred activities consistent with its general mission. ................................................37

        3.   *Havens* does not confer standing where, as here, CAIR-AZ is engaging in pure issue advocacy........................40

III.  This Court may also affirm dismissal because Appellants failed to identify an official policy giving rise to their alleged injuries....................43

    A.   Respondeat superior liability does not apply to Section 1983 claims. ...............................................................43

    B.   The Complaint does not allege an "official policy" that could support Section 1983 liability against MCCCD. .............................44

IV.  The district court correctly dismissed Mr. Sabra's First Amendment claims for failure to state a claim. ..............................................................46

    A.   Standard of review and legal standard...............................46

    B.   Mr. Sabra failed to state an Establishment Clause claim. .................47

        1.   The primary effect standard requires an informed and objective observer and does not categorically prohibit all disapproval of religion. .....................................48

2. Sabra failed to sufficiently allege Dr. Damask's course materials had the primary effect of advancing or inhibiting religion. .................................................51

3. The few cases addressing Establishment Clause challenges to college or advanced secondary course content universally reject arguments based on alleged religious offense........................................................55

4. The relief sought by Appellants would itself result in a violation of the Establishment Clause. ...................................57

C. Mr. Sabra failed to state a Free Exercise claim.................................59

1. Mr. Sabra failed to allege a substantial burden on his religious practice.........................................................59

2. MCCCD has a compelling interest in ensuring a robust education that challenges students' preconceived ideas...........61

V. The district court correctly dismissed the claims against Dr. Damask under qualified immunity. ...........................................62

CONCLUSION ...................................................63

STATEMENT OF RELATED CASES.................................64

CERTIFICATE OF COMPLIANCE ...................................65

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Diabetes Ass'n v. United States Dep't of the Army*,
   938 F.3d 1147 (9th Cir. 2019)................................................38

*Am. Family Ass'n. Inc.*, v. City & Cty. of S.F., 277 F.3d 1114 (9th Cir.
   2002) ........................................................ 47, 54, 59, 60

*An v. City of New York*,
   230 F. Supp. 3d 224 (S.D.N.Y. 2017) ............................................44

*Animal Legal Def. Fund v. Kelly*,
   434 F. Supp. 3d 974 (D. Kan. 2020) ..............................................38

*Bauchman v. W. High Sch.*,
   132 F.3d 542 (10th Cir. 1997)................................................46

*Brown v. Li*,
   308 F.3d 939 (9th Cir. 2002).................................................60

*Brown v. Woodland Joint Unified Sch. Dist.*,
   27 F.3d 1373 (9th Cir. 1994)..............................................49, 59

*Cal. Parents for Equalization of Educ. Materials v. Torlakson*,
   267 F. Supp. 3d 1218 (N.D. Cal. 2017)................................59, 60, 61

*Cal. Parents for Equalization of Educ. Materials v. Torlakson*,
   370 F. Supp. 3d 1057 (N.D. Cal. 2019)....................................49, 51

*Catholic League for Religious and Civil Rights v. City and Cty. of*
   *S.F.*,
   624 F.3d 1043 (9th Cir. 2010)..............................................33, 47

*Christie v. Iopa*,
   176 F.3d 1231 (9th Cir. 1999)................................................45

*Conservative Baptist Ass'n of Am., Inc. v. Shinseki*,
   42 F. Supp. 3d 125 (D.D.C. 2014) ............................................39

*Ctr. for Law & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005) ....................................................................40

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010)........................................................................47

*Fair Elections Ohio v. Husted*,
    770 F.3d 456 (6th Cir. 2014)........................................................................35

*C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*,
    654 F.3d 975 (9th Cir. 2011)...................................................................*passim*

*Fed. Election Comm'n v. Akins*,
    524 U.S. 11 (1998)........................................................................................36

*Fleischfresser v. Directors of Sch. Dist. 200*,
    15 F.3d 680 (7th Cir. 1994)..........................................................................61

*Florey v. Sioux Falls Sch. Dist. 49–5*,
    619 F.2d 1311 (8th Cir. 1980)................................................................31, 48

*Freedom from Religion Found. v. Hanover Sch. Dist.*,
    626 F.3d 1 (1st Cir. 2010) ............................................................................46

*Gheta v. Nassau Cty. Cmty. Coll.*,
    33 F. Supp. 2d 179 (E.D.N.Y. 1999).......................................................*passim*

*Grove v. Mead Sch. Dist. No. 354*,
    753 F.2d 1528 (9th Cir. 1985).......................................................................31

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)................................................................................*passim*

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020).....................................................................38

*Keyishian v. Bd. of Regents of Univ. of N.Y.*,
    385 U.S. 589 (1967).......................................................................................31

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010).................................................................32, 33

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*,
    903 F.3d 113 (3d Cir. 2018)................................................................................58

*Lee v. Weisman*,
    505 U.S. 577 (1992)........................................................................................60

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971)..................................................................................*passim*

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).......................................................................................32

*McCollum v. Bd. of Educ.*,
    333 U.S. 203 (1948).......................................................................................62

*McQuillion v. Schwarzenegger*,
    369 F.3d 1091 (9th Cir. 2004).......................................................................43

*Mecinas v. Hobbs*,
    468 F. Supp. 3d 1186 (D. Ariz. 2020) ..........................................................41

*Miller v. City of St. Paul*,
    823 F.3d 503 (8th Cir. 2016).........................................................................44

*Monell v. Dep't of Soc. Serv.*,
    436 U.S. 658 (1978).......................................................................................44

*Okla. City v. Tuttle*,
    471 U.S. 808 (1985).......................................................................................44

*Parker v. Hurley*,
    514 F.3d 87 (1st Cir. 2008) ...................................................... 46, 59, 60, 61

*Project Sentinel v. Evergreen Ridge Apts.*,
    40 F. Supp. 2d 1136 (N.D. Cal. 1999)..........................................................41

*Regents of the Univ. of Mich. v. Ewing*,
    474 U.S. 214 (1985)................................................................................ 10, 31

*Resident Councils of Wash. v. Thompson*,
    C04-1691Z, 2005 WL 1027123 (W.D. Wash. May 2, 2005)..........................40

*Rodriguez v. City of San Jose*,
  930 F.3d 1123 (9th Cir. 2019)......................................................... 37, 38, 39, 40

*Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*,
  605 F.3d 703 (9th Cir. 2010).......................................................... 31, 32, 39, 62

*Sierra Club v. Morton*,
  405 U.S. 727 (1972)........................................................................... 36, 37

*Smith v. Odessa Junior Coll. Dist. Individually*,
  MO-11-CV-095, 2014 WL 12558000 (W.D. Tex. Jan. 14, 2014) ...................43

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982)............................................................................ 33, 34

*Vasquez v. Los Angeles Cty.*,
  487 F.3d 1246 (9th Cir. 2007).............................................................. 46, 54

*Vernon v. City of Los Angeles*,
  27 F.3d 1385 (9th Cir. 1994)................................................................ 54, 55

*Warth v. Seldin*,
  422 U.S. 490 (1975)................................................................................ 36

*We Are Am./Somos Am., Coal. v. Maricopa Cty. Bd. of Supervisors*,
  809 F. Supp. 2d 1084 (D. Ariz. 2011) ...................................................... 40

*Wood v. Arnold*,
  915 F.3d 308 (4th Cir. 2019).................................................................. 49, 60

*Young Advocates for Fair Educ. v. Cuomo*,
  359 F. Supp. 3d 215 (E.D.N.Y. 2019) ...............................................*passim*

## Statutes & Rules

42 U.S.C. § 1983.............................................................................*passim*

Fed. R. Civ. P. Rule 12 ..................................................................*passim*

## Other Authorities

*CAIR-AZ, Who We Are*,
  https://cair-az.org/about-us/who-we-are/......................................................10

*Department of State, Foreign Terrorist Organization*,
   https://www.state.gov/foreign-terrorist-organizations/ ....................................16

## INTRODUCTION

Appellants Mohamed Sabra and the Council on American-Islamic Relations of Arizona ("CAIR-AZ") seek to "judicially censor" the content of a college-level World Politics class because they find a portion of its subject matter—discussing terrorism, premised on professed Islamic beliefs—offensive to Mr. Sabra's personal views and in conflict with CAIR-AZ's mission of "promot[ing] a positive image of Islam and Muslims in America."[1] While it is understandable that Appellants may be upset by discussion of views that they consider to be "radical" or outside the "mainstream" of Islam, censoring academic speech is dangerous, wrong, and antithetical to academic freedom—a "special concern" under the First Amendment.[2] Indeed, both below and on appeal, Appellants fail to cite even a single case that has accepted their argument, making it—literally—unprecedented. *E.g.*, *C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 986 (9th Cir. 2011) ("[T]here has never been any reported case holding that a teacher violated the Establishment Clause by making statements in the classroom that were allegedly hostile to religion.").

---

[1] CAIR-AZ, WHO WE ARE, *available at* https://cair-az.org/about-us/who-we-are/.

[2] *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985).

More troubling, Appellants' arguments improperly attempt to entangle the Court in policing what should be taught in a college-level political science course, based on whether disputed religious perspectives are purportedly (as Appellants claim) "false," "inaccurate," "gross misinterpretations," or considered "radical." The First Amendment affirmatively prohibits courts from wading in to settle such "doctrinal disputes."

The district court correctly dismissed Appellants' claims under Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P., for several reasons, each of which was—and remains—independently fatal as a matter of law:

- First, CAIR-AZ lacks Article III standing because: (a) a mere "setback to the organization's abstract societal interests," (b) use of resources in the normal course of its mission, and (c) engagement in social advocacy are insufficient to confer standing; otherwise, anyone with a "generalized grievance" could "manufacture standing in order to enjoin conduct that they object to as a public policy matter."

- Second, CAIR-AZ also lacks standing because Appellants did not—and cannot—allege an "official policy" of MCCCD as the purported cause their alleged injuries under Section 1983.

- Third, Appellants' personal feelings of offense or antipathy, or even "some disapproval" of religion, is insufficient as a matter of law to state

11

an Establishment Clause claim under the "primary effect" prong of *Lemon*.

- Fourth, College-level curriculum that merely conflicts with Mr. Sabra's religious beliefs and requires him to show understanding of course content he finds offensive does not substantially burden Mr. Sabra's ability to practice his religion and is legally insufficient to state a claim under the Free Exercise Clause.

- Finally, Appellants' claims against Dr. Damask in his individual capacity fail because he is entitled to qualified immunity.

## JURISDICTION

Appellee Maricopa County Community College District ("MCCCD") agrees with Appellants' statement of jurisdiction, subject to MCCCD's jurisdictional standing arguments discussed below.

## ISSUES PRESENTED

1. Appellant CAIR-AZ is a non-profit organization involved in social advocacy, with no prior connection to the online community college World Politics course with which it takes issue. Yet in district court, CAIR-AZ asserted standing based on its own alleged injury – namely diversion of resources for a religious scholar to assist in a social

advocacy campaign. Did the district court correctly hold CAIR-AZ lacked organizational standing?

2.  Appellant MCCCD is a community college district. Yet Appellants have failed to allege any policy or custom at MCCCD's level giving rise to their claims under Section 1983. Should the district court's dismissal of claims against MCCCD be upheld for lack of an official policy?

3.  Appellant Sabra invokes the Establishment Clause to judicially censor statements about Islamic terrorism in a college-level World Politics course, claiming that the statements are religiously offensive. Did the district court correctly consider the context surrounding the statements under *Lemon v. Kurtzman*, 403 U.S. 602 (1971) and dismiss Appellant Sabra's Establishment Clause claim?

4.  Appellant Sabra took an online quiz in the World Politics course. To demonstrate his knowledge, he had to click statements he found religiously offensive in completing the quiz. Did the district court correctly dismiss Appellant Sabra's Free Exercise Clause claim because he failed to allege a substantial burden on the exercise of his religion?

5.    Is Dr. Damask entitled to qualified immunity, based on what this Court has described as the "dimly perceived line of demarcation" in First Amendment claims against school officials, and consistent with courts' uniform rulings on such issues in every published decision since the country's founding?

## STATEMENT OF THE FACTS AND CASE

### A.    The Parties.

Appellant Mohamed Sabra is a former student of the Spring 2020 online World Politics course at Scottsdale Community College ("SCC"), taught by Dr. Nicholas Damask. ER-178–79 ¶¶ 1, 7.

SCC is one of several MCCCD colleges in the greater Phoenix, Arizona metropolitan area.[3] Consistent with the academic freedom necessary to provide a well-rounded education, MCCCD sets general guidelines and regulations for its colleges but leaves decisions regarding course content to professors. This dynamic is apparent in MCCCD Regulation 3.6, cited in Appellants' Complaint, which for recordkeeping purposes requires that a skeletal syllabus be filed with the relevant "division/department office" within the applicable college "by the end of the first week" of each course. ER-52. Neither MCCCD Regulation 3.6 nor any other

---

[3] The Complaint refers to SCC and MCCCD interchangeably, but they are separate entities. *See* ER-178 ¶ 3.

regulation requires or contemplates a substantive review of course content by MCCCD. *Id.*

Appellant CAIR-AZ is a non-profit organization engaged in "correcting" what it considers "Islamophobic information" and in "advocacy and protecting the civil rights of American Muslims while promoting justice." ER-49. CAIR-AZ provides no specific services beyond social advocacy. *Id.* After learning about what it considers "instruction based on one-sided, biased perspectives of Islam" that "excludes other ideologies of Islam" in the SCC World Politics course, Appellant CAIR-AZ filed this lawsuit. ER-178–79 ¶ 7.

> **B.    The World Politics Course.**

As explained in the World Politics syllabus, attached to Appellants' Complaint, Dr. Damask's course focuses on "the principles and issues relating to the study of international relations" and is broken into six modules:  (1) "Realism," (2) "Idealism and International Law," (3) "Images of the World," (4) "Three World Wars," (5) "Globalization and the World Economy" and (6) "Islamic Terrorism." ER-232–33. Each module consists of a PowerPoint lecture, supplemental reading materials, and an online quiz.  ER-178–79 ¶¶ 7–9; ER-231. One of the course's ten broad goals is to explore "the political, economic, national, and transnational rationale for international interactions." ER-230. The syllabus is silent on world religions generally or Islam specifically, other than its one reference to "Islamic

Terrorism." ER-233. Further, as Appellants concede, the syllabus is nondescript as to the statements they find offensive: it "does not state that it includes instruction based on one-sided, biased perspectives of Islam or that it excludes other ideologies of Islam." ER-178–79 ¶ 7.

Consistent with the expected academic freedom and debate in all college courses, the syllabus encourages direct communication between students and Dr. Damask regarding course content. ER-234.

### C. The Islamic Terrorism Module.

The last of the six modules in the World Politics course focuses on international terrorism. When discussing historical international terrorism, the materials cover several religious and non-religious terrorist groups. Yet the name of the module, "Islamic Terrorism," derives from the fact that contemporary terrorism on an international scale is almost exclusively associated with groups that profess belief in Islam. As indicated by sourced facts in the course material, the vast majority of international terrorist groups designated "Foreign Terrorist Organizations" by the State Department claim a religious foundation on Islam. ER-124.[4]

---

[4] *See* Department of State, Foreign Terrorist Organization, *available at* https://www.state.gov/foreign-terrorist-organizations/. The few non-Islamic organizations on the list are generally either functionally defunct or not international in nature.

The PowerPoint lecture for the sixth World Politics module is broken into three parts: (1) a definition of what terrorism is and how it is distinguished from other forms of political violence, along with a history of international terrorism ("Defining Terrorism"); (2) theories relating to the rise of, and justification for, terrorism within Islam specifically ("Islamic Terrorism: Definition"); and (3) an analysis of how different political schools of thought approach solving the problem of terrorism by those professing a belief in Islam ("Islamic Terrorism: Analysis"). ER-179 ¶ 10; ER-105.

In the "Defining Terrorism" section, the PowerPoint lecture first explains theoretical motivations behind terrorist acts by several groups, including the early religious Zealots (Jewish), Assassins (Islamic), and Thuggees (Hindu). ER-118–20. This section then discusses "nationalist/right-wing terrorism" (e.g., Nazis (Germany), KKK (U.S.), hakki ichiu (Japan)) and "communist/left-wing terrorism" (e.g., People's Will (Russia), Red Army (Germany), Provisional Irish Republican Army (Northern Ireland), Weather Underground (U.S.), Sendero Luminoso (Peru), and the Khmer Rouge (Cambodia)) in the nineteenth and mid-twentieth centuries. ER-121–23.

The "Islamic Terrorism: Definition" section of the PowerPoint lecture discusses the motivations of Islamic terrorists—those who, by definition, both commit acts of terrorism and profess a belief in Islam. When read in context of the

topic being analyzed—Islamic terrorism, as distinct from the Islamic religion—it becomes clear that none of the references to Islam seek to endorse or inhibit belief in the religion in any way. ER-126–40.

For example, Slide 25 explains that "*Islamic terrorists* sanctify their actions through pious references to the Quran and the traditions of the Prophet Muhammad." ER-129 (emphasis added). Thus, when Slide 25 theorizes in the next paragraph a connection between (1) Islamic jurisprudence and religious texts and (2) support for warfare and violence, it does so from the perspective of those seeking to sanctify or justify violent acts in the name of Islam. *Id*. Moreover, "warfare" and "violence" are not, as Appellants suggest, equivalent to "terrorism"; rather, as a reasonable observer would recognize, these terms are much broader and include the right to engage in self-defense, and other protective behavior that falls outside the narrower term.

Similarly, Slide 23 discusses the "theological mandate for jihad" but clearly does so from the perspective of terrorists seeking justification for their actions. ER-127. In describing the "efforts" required in jihad, Slide 22 states that they are "physical, not simply prayer or introspection." ER-126. Notably, the statement does not preclude prayer and introspection or any other kind of spiritual or emotional struggle within the definition of jihad. Moreover, there are many forms of physical action that do not involve terrorism, including potentially self-defense or actual warfare. Thus, when Slide 22 goes on to state that "jihad is a religiously-justified,

communal mobilization of the resources and capabilities of the Muslim population for war against unbelievers," it is decidedly not stating that the Muslim population generally condones terrorism. *Id*. It is simply explaining the justifications offered by those in Islam who do support terrorism.

Other slides in the "Islamic Terrorism: Definition" section make broad statements regarding support of terrorism or specific acts of terrorism by Islamic legal authorities. Yet it is clear from context that statements about "nearly every Islamic legal authority of any significance" or "unanimous" legal support for terrorism or terrorist acts refer to sources terrorists would consider authoritative. ER-132; ER-137.

The "Islamic Terrorism: Analysis" section further highlights the religious neutrality of the material. This section discusses three scholarly theories about the causes of terrorism within Islam. For each theory, at least one scholar is identified, and their ideas are presented. For example, on Slides 39-40, in a sub-section discussing a "clash of civilizations" theory attributed to scholar Samuel Huntington, a bullet point states that "Muslim popular opinion has some sympathy for terrorism generally, and the ultimate goals of terror group (sharia) particularly." ER-143–44. As indicated in the presentation, this statement reflects only the views of those who espouse the "clash of civilizations" theory, like Mr. Huntington. Similarly, Slide 41 attributes to scholar Peter Bergen the "[n]eoliberal[]" idea that "the main terrorist

threat comes from 'Islamists' radical terror groups such as al Qaeda that represent a 'twisted' variant of Islam as a whole." ER-145. Appellants argue (at 11) that Dr. Damask bolded and underlined the term "sympathy" in reference to the Huntington slide for emphasis; in fact, the term is not bolded or underlined for emphasis—rather, the word is merely hyperlinked to research results conducted by the Pew Research Center.

Contrary to Appellants' repeated refrain throughout their brief and in the Complaint, nowhere in any of the course materials is it ever stated that: "Muslims have a 'theological mandate' to kill Non-Muslims" or that "Islam is terrorism." ER-85. As the district court held, such conclusions can only be manufactured by improperly decontextualizing statements in the course content.

**D.  Mr. Sabra is offended.**

After taking the quiz associated with this topic, Mr. Sabra emailed Dr. Damask to let him know that he was offended by some of the questions, which he considered to be "in distaste of Islam" and caused him to "fe[el] disgust." ER-185 ¶ 53; ER-236.

**E.  Dr. Damask's discussions with Mr. Sabra.**

Dr. Damask promptly responded to Mr. Sabra, explaining that: no offense was intended; "the course content isn't 'for' or 'against' anything"; and the materials and quiz questions focused on views of Islam expressed by terrorist groups—which

20

"may be quite wrong" or may be "twisted . . . from a kernel of truth into something horribly misguided." ER-237–38. Moreover, consistent with the course's goals, the content related to this topic "aim[ed] to explain international politics," including the "phenomenon of terrorism in international politics" as well as the use of terrorism by some in a "way that amounts to carrying out their own foreign policy according to their deeply held beliefs." *Id.*

Mr. Sabra then asked Dr. Damask to review the three questions Mr. Sabra found offensive and explain them further:

9. Where is terrorism encouraged in Islamic doctrine and law? -Medina verses.

12. Who do Islamic terrorists strive to emulate? -the Prophet Muhammad.

20. Terrorism is ___ in Islam. -Justified within the context of jihad.

ER-184–86 ¶¶ 38–53; ER-156; ER-159; ER-167.

Dr. Damask again promptly responded, explaining that these questions came from the section of the course seeking to understand terrorists' justification of their actions and that:

these interpretations [of the Quran and other religious writings] by the terrorists may be quite wrong-headed. But try not to think about whether the terrorists' beliefs are "right" or "wrong" or "true" -- you should approach the discussion thinking simply, "what beliefs motivate them no matter how wrong they may be".

ER-240–41. Dr. Damask further explained that "analysis of [terrorists'] beliefs would come later [in the course and in the quiz], once the motivations of the terrorists

are understood. And, as discussed in the content, there are widely different theories, from Bernard Lewis, to Peter Bergen to Samuel Huntington about how to proceed against terrorism." ER-241. Dr. Damask ended his email by reiterating that Mr. Sabra was "free to contact [him] any time" to discuss further. *Id.*

### F. Mr. Sabra's appeal to social media.

In the meantime, before receiving Dr. Damask's reply, and instead of engaging with Dr. Damask further or discussing with SCC administration, Mr. Sabra posted the quiz questions on social media—without any of the context provided in the lecture or from Dr. Damask's emails. ER-185 ¶ 54.

### G. Response to social media backlash.

The decontextualized response from social media included death threats to Dr. Damask. SCC initially responded by issuing a hasty apology. ER-243–44. On May 11, 2020, upon a more careful review of the matter in context, however, MCCCD subsequently issued a public statement, explaining that the three quiz questions "were taken out of context from a unit examining violent political and social movements, and the subject they addressed – the reliance of certain violent groups on religious texts as a justification for their actions – was within the scope of the course." ER-174. Consistent with upholding principles of academic freedom, the statement further affirmed: "[W]e . . . expect our students and faculty to engage fully

22

with the ideas and perspectives of others, even when they disagree with each other." ER-175.

**H.      Mr. Sabra completes the course and files suit.**

After completing the course, Mr. Sabra and CAIR-AZ filed this lawsuit, claiming that Defendants violated the Establishment and Free Exercise Clauses of the First Amendment, not only because of the three quiz questions but also because, in their view, Dr. Damask's "primary message is the disapproval of Islam." ER-187 ¶ 69.

**I.      The Complaint.**

In their Complaint, Appellants ignore the portions of the terrorism module that contradict their theory that the course content was designed as a general condemnation of Islam. More concerning, Appellants then don a "curriculum review" hat and provide extensive critique on how they think the course should be taught in order to promote a more favorable view of Islam.

Appellants first ignore the general context—this is a college-level, political science class, focused on world politics—not a religion class, focused on Islamic beliefs, generally.  Appellants also ignore the specific context, including discussion that is provided in the unit on terrorism that has no connection whatsoever to Islam. For example, despite references on Slide 17 (ER-121) to terrorism by "Nazis in

1920s-1940s Germany" and the "Ku Klux Klan in 1860s-1980s United States,"

Appellants allege that:

> Notably absent from any of Defendant Damask's terrorism materials is
> any discussion of the Ku Klux Klan, Nazi's, militant fascism and neo-
> conservatism, and their scripture-based terrorism against African
> Americans, Judaism, and other ethnic minorities throughout history in
> the United States. . . .

> It is an unquestionable fact that the Ku Klux Klan espoused Protestant
> Christian ideologies to wage terror in the United States in an attempt to
> create their own nation-state, and even believed that Jesus was the first
> Klansman. However, none of this material is discussed in any of
> Defendant Damask's modules, despite its impact on national and
> international politics. . . .

ER-179–80 ¶ 15.

Appellants next criticize Dr. Damask for not providing what Appellants

consider the appropriate "counter-arguments or opposing viewpoints" necessary to

ensure the course does not (in their view) cross the line into "Islamophobia." ER-

180 ¶ 17. For example, they argue that Dr. Damask should have disclosed that his

quotations of the word "terrorize" and "terror" from translations of Islamic religious

texts are inaccurate because "many translations of these verses by actual scholars do

not even use the words 'terrorize' or 'terror.'"  ER-181 ¶ 23. Appellants assert that

Dr. Damask should have articulated "more acceptable and in fact, mainstream views

of 'jihad.'" ER-183 ¶ 34. Appellants claim that Dr. Damask should have explained

that one of the authors he cites, Walid Phares, "is not a neutral author and only

represents *one* perspective – an extreme perspective" and that Mr. Phares' apparent

"anti-Muslim ideologies" and ties to "international criminal and Lebanese fascist, Samir Geagea" are "critical facts that should have been disclosed by the Defendants to students." ER-183 ¶ 35–36.

In these and other paragraphs in the Complaint, Appellants asked the district court to judicially censor statements they found religiously offensive. In Appellants' view, Dr. Damask should teach only the version of Islam that most closely resembles their own beliefs.

### J.    The Motion to Dismiss.

Appellees MCCCD and Dr. Damask moved to dismiss Appellants' Complaint for lack of standing and for failure to state a claim under Rules 12(b)(1) and 12(b)(6). Because Mr. Sabra had already completed the World Politics course, Appellees argued that Appellants' prospective and declaratory relief claims were moot. MCCCD also raised the same arguments it now raises on appeal, including that CAIR-AZ lacks standing and that Mr. Sabra failed to state either an Establishment Clause or Free Exercise Clause claim. Dr. Damask additionally raised the defense of qualified immunity.

### K.    Oral Argument.

At oral argument, Appellants failed to provide any additional context on CAIR-AZ's alleged diversion of resources. They simply reiterated that CAIR-AZ

"hired a scholar to literally respond to the allegations that – that [Dr.] Damask makes in his PowerPoint." ER-40 at 12–22.

Appellants also continued to misstate and decontextualize Dr. Damask's course materials and wrongly attribute to him the statements of scholars he cites. For example, Appellants misquoted Quiz question number 19, stating:

> The quiz questions -- question number 19 literally says -- I'll read it. It's in Exhibit C. Gullible westerners are taught that jihad can have two meanings. People in the Arabic world understand that its overwhelming obvious meaning is -- and his answer was what it is, struggle against sin. That's what Muslims believe jihad is. So he chose struggle against sin. No, he got it wrong, because in order to get it right, he would have to say that jihad is combat or war.

ER-38 at 4–12. Question 19 actually states:

> Walid Phares notes that although "gullible" Westerners are taught that jihad can have two meanings, people in the Arabic world understand that its overwhelmingly obvious meaning is _____.

ER-166.

Mr. Sabra incorrectly chose the answer "struggle against sin," when the course material explained Mr. Phares' view that jihad means "combat" or "war," and the quiz question asked Mr. Sabra to demonstrate understanding of Mr. Phares's view. *Id*. Mr. Sabra was never compelled to agree with Mr. Phares' view or even Dr. Damask's view. He simply had to read the material and choose the answer that most closely reflected the information in the material.

**L.      The district court dismisses Appellants' claims.**

In dismissing the complaint, the district court first agreed with Appellees that CAIR-AZ lacks organizational standing. The court reasoned that even if CAIR-AZ hired a religious scholar to counteract the statements it finds offensive in the World Politics course, CAIR-AZ did not state "how hiring a religious scholar to create materials to advocate against Islamophobic information is anything out of the realm of the normal advocacy that they do." ER-9. The court also noted Appellants' failure to identify from where the resources were "divert[ed]" to create the advocacy campaign. *Id*. Failing to allege any diversion of resources "that is not a normal part of [CAIR-AZ's] activities" prompted dismissal of CAIR-AZ's claims, for lack of standing. ER-10.

The district court also granted Appellee's Motion to Dismiss Mr. Sabra's First Amendment claims because he failed to state a substantive claim as a matter of law. In dismissing the Establishment Clause claim, the court properly applied the framework established by *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971) and held that "[e]xamining the course as a whole, a reasonable, objective observer would conclude that the teaching's primary purpose was not the inhibition of religion." ER-11. The court reasoned that "[o]nly in picking select quotes from the course can one describe the module as anti-Islam." *Id*. The court recognized the course material referencing the views of scholars like Peter Bergen that appear to align more closely

to Appellants' own views – namely, that "the terrorist threat comes from radical terror groups that represent a 'twisted' variant of Islam as a whole." *Id*. The court also noted Appellants' mischaracterization of Question 19 in the online quiz. The court concluded that "the primary effect of Dr. Damask's course is not he inhibition of the practice of Islam." *Id*.

 In dismissing Mr. Sabra's Free Exercise claim, the district court correctly concluded Mr. Sabra had failed to allege a substantial burden on the right to exercise his religion. The court noted that "Mr. Sabra was not required to adopt the views expressed by Dr. Damask or the authors Dr. Damask cited to in his course, but only to demonstrate an understanding of the material taught." ER-13. Noting that the course did not "inhibit Mr. Sabra's personal worship in any way," the court found no violation of the Free Exercise Clause. *Id*.

Concluding that existing Establishment Clause and Free Exercise Clause precedent failed to put Dr. Damask "on notice that his actions might be unconstitutional," the district court also held that Appellants' claims against Dr. Damask in his individual capacity were barred by the doctrine of qualified immunity.

## SUMMARY OF ARGUMENT

Consistent with principles of academic freedom, long-standing First Amendment law, and principles of standing, this Court should uphold the dismissal

CAIR-AZ's claims for lack of standing and Mr. Sabra's claims for failure to state a claim, as a matter of law.

CAIR-AZ cannot assert standing under traditional Establishment Clause and Free Exercise Clause jurisprudence. In its Complaint, CAIR-AZ therefore seeks to rely solely on its own alleged injury by claiming it was forced to divert resources to a public relations campaign to counteract the content in Dr. Damask's course. Yet CAIR-AZ failed to allege its public relations campaign was anything other than its preferred use of its funds. CAIR-AZ also failed to allege that it engages in any activities other than pure issue advocacy. In such cases organizational standing is not recognized because a contrary ruling would permit anyone with a "generalized grievance" to "manufacture standing in order to enjoin conduct that they object to as a public policy matter." *Young Advocates for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 232 (E.D.N.Y. 2019).

Mr. Sabra's First Amendment claims are essentially requests to delete from the World Politics course all statements he finds religiously offensive; to correct what he claims be false doctrine; and to teach the variant of Islam that most closely aligns with more mainstream views or his own beliefs. Mr. Sabra fails to state either an Establishment Clause or Free Exercise Clause claim.

Mr. Sabra's Establishment Clause claim fails because he does not sufficiently allege disapproval of his religion. An objective reading of the course content, viewed

in context, recognizes that: (a) the course is focused on world politics—not religion; (b) the terrorism module focuses on those who justify terrorism—including by reference to Islam—as a means of achieving political objectives; and (c) the course is expressly *not* focused on an exposition of doctrinal disputes within the Islamic faith or on interpretations of Islamic doctrine that do not justify or promote terrorism.

Mr. Sabra's Free Exercise Clause claim fails because he does not sufficiently allege a substantial burden on his right to exercise his religion. Being asked to recall and demonstrate understanding of course material that Mr. Sabra may find religiously offensive on a personal level does not burden his religious practice. Even if Mr. Sabra has asserted a burden on his religious activities, the state's interest in providing a robust education to college students outweighs this burden.

This Court should uphold the dismissal of Appellants' claims.

## ARGUMENT

## I.    Principles of academic freedom underly each of MCCCD's arguments.

A most troubling aspect of Appellants' position, which permeates the entire Complaint, is Appellants' effort to turn the district court—and now this Court—into a curriculum oversight committee, by which Appellants seek to drown out ideas with which they disagree and which are antithetical to their preferred views.  Federal courts, however, properly invoke the First Amendment to eschew such invitations, noting the judiciary's "responsibility to safeguard [schools'] academic freedom, 'a

special concern of the First Amendment.'" *Regents*, 474 U.S. at 226 (quoting *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967)) (noting further judicial "reluctance to trench on the prerogatives of state and local educational institutions"). "To afford academic speech the breathing room that it requires, courts must defer to colleges' decisions to err on the side of academic freedom." *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 709 (9th Cir. 2010). Academic freedom should therefore be considered when addressing any of the parties' arguments.

Even when competing constitutional religious rights are at stake, academic freedom must still be preserved. As this Court has recognized, if courts were to "eliminate everything that is objectionable to any of [the religious bodies existing in the United States] or inconsistent with any of their doctrines, [they would] leave public education in shreds." *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1533 (9th Cir. 1985) (quoting *Florey v. Sioux Falls Sch. Dist. 49–5*, 619 F.2d 1311, 1318 (8th Cir.), *cert. denied*, 449 U.S. 987 (1980)). "If it were unconstitutional to require students to read books in which concepts coinciding with their religious beliefs came under question, then thousands of college courses throughout the country would be invalidated, including courses on philosophy, history, religion, literature, and biology." *Gheta v. Nassau Cty. Cmty. Coll.*, 33 F. Supp. 2d 179, 185 (E.D.N.Y. 1999).

The need for academic freedom is enhanced at the college level: "If colleges are forced to act as the hall monitors of academia, subject to constant threats of litigation both from professors who wish to speak and listeners who wish to have them silenced," many would steer away from any controversial topics or professors to avoid litigation. *Rodriguez*, 605 F.3d at 708-09 (relying in part on academic freedom grounds to reject First Amendment claim). Likewise, "teachers must . . . be given leeway to challenge students to foster critical thinking skills and develop their analytical abilities. . . . [W]e must be careful not to curb intellectual freedom by imposing dogmatic restrictions that chill teachers from adopting the pedagogical methods they believe are most effective." *C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 988 (9th Cir. 2011).

## II. The district court correctly dismissed CAIR-AZ's claims for lack of organizational standing.

### A. Standard of review and legal standard.

"A district court's decision regarding standing is reviewed de novo." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1087 (9th Cir. 2010). "The standing doctrine limits federal court jurisdiction." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "It is well established that the 'irreducible constitutional minimum of standing' consists of these three elements: (1) injury in fact; (2) causation; and (3) redressability." *Id.* at 1088 (quoting *Lujan*, 405 U.S. at 560-61). "While the *Lujan* decision established the

'irreducible constitutional minimum' test for standing in the context of an individual plaintiff, the same analysis is used to determine whether an organizational plaintiff has standing in a particular case." *Id.*

For standing in Establishment Clause cases, courts consider whether there has been "government action respecting an establishment of religion" causing injury to individual plaintiffs or, in the case of organizations, to their members in their own "political community" that can be redressed by the court. *Catholic League for Religious and Civil Rights v. City and Cty. of S.F.*, 624 F.3d 1043, 1049-52 (9th Cir. 2010). The government action need not result in physical injury; however, psychological injury is generally insufficient absent "government condemnation of one's own religion or endorsement of another's in one's own [political] community." *Id.* at 1052.

## B.   CAIR-AZ lacks standing under Establishment Clause jurisprudence.

CAIR-AZ does not and cannot rely on established standing theories from Establishment Clause cases. The materials and statements at issue in this case were made in an online college course and were not directed at CAIR-AZ members in any political community. Rather, CAIR-AZ is like the organization in *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982). After learning through a press release of the federal government conveying land to a religious institution with no payment in return, the organization

33

filed a lawsuit to challenge the transaction. The Supreme Court upheld dismissal of the organization's claims for lack of standing, noting that the organization failed to "identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge*, 454 U.S. at 485. Like the organization in *Valley Forge*, CAIR-AZ learned of the material in the World Politics course through social media and sought to involve itself in censoring the material, based on the "psychological consequence presumably produced by observation of conduct with which [CAIR-AZ] disagrees." Standing cannot derive from such a contrived basis. Under any theory of standing recognized by federal courts in Establishment Clause cases, CAIR-AZ lacks standing.

### C. *Havens* has never conferred standing on organizations asserting Establishment Clause or Free Exercise claims.

Recognizing there is no viable path to standing for its claims under Establishment Clause precedent, CAIR-AZ instead tries to manufacture standing from the framework set forth in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). However, as set forth below, *Havens* is likewise and untenable basis for standing, as a matter of law.

*Havens* involved an organization that brought a claim against an apartment complex, alleging racial steering practices in violation of the Fair Housing Act. The Supreme Court found standing to pursue a damages claim because the apartment

complex's steering practices and the actions the organization took to combat them perceptively impaired the organization's ability to provide housing counseling and referral services.

Appellants cite no cases in which the *Havens* framework has conferred standing to an organization for Establishment Clause or Free Exercise claims. Indeed, because plaintiffs in Establishment Clause and Free Exercise cases, like Appellants, typically ask courts for prospective/injunctive relief related to abstract constitutional rights, there is a "critical difference" between such cases and *Havens*. *Young Advocates*, 359 F. Supp. 3d at 231. Namely, "in *Havens*, [the plaintiff] sought only damages for [concrete] past expenses." *Id*. In contrast, permitting an organization to assert standing solely for prospective/injunctive relief "raises a concern that was absent in *Havens*, namely, the prospect that a citizen with a generalized grievance might manufacture standing in order to enjoin conduct that they object to as a public policy matter." *Id.* at 232; *see also Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 n.1 (6th Cir. 2014) (voter outreach organization lacked standing to challenge absentee ballot procedures; distinguishing *Havens* because, inter alia, the *Havens* plaintiff "sought [only] damages, not an injunction"). Accordingly, standing under *Havens* was properly rejected by the district court in this case.

**D.** ***Havens* expressly excludes organizational standing in circumstances applicable to CAIR-AZ.**

Even if *Havens* could be applied to First Amendment claims seeking injunctive relief (it does not), the district court properly concluded that CAIR-AZ still lacked standing for at least three additional, independent reasons: (1) standing cannot stem from a mere "setback of the organization's abstract societal interests"; (2) standing does not attain where the alleged diversion of resources is vague and amounts only to the organization merely "going about its business as usual"; and (3) standing cannot be manufactured when the activities from which organizational resources were diverted constitute "pure issue advocacy."

**1.** ***Havens* does not permit standing based on a setback to CAIR-AZ's abstract societal interests.**

First, *Havens* and its progeny expressly reject standing where the alleged injury consists—as it does here—of merely "a setback to [an] organization's abstract social interests." *Havens*, 455 U.S. at 379. *see also Sierra Club v. Morton*, 405 U.S. 727, 739 (1972); *Warth v. Seldin*, 422 U.S. 490, 500 (1975). "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to" establish standing. *Sierra Club*, 405 U.S. at 739; *see also Warth*, 422 U.S. at 500 (Federal courts should not "be called upon to decide abstract questions of wide public significance . . . ."); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998)

("[A]bstract" harm, such as "injury to the interest in seeing that the law is obeyed," lacks "the concrete specificity" necessary for standing).

The Supreme Court in *Havens* held that direct standing for an organization can only be based on "concrete and demonstrable injury to the organization's activities." 455 U.S. at 379. In *Havens*, the organization suffered concrete harm in its "ability to provide counseling and referral services for low- and moderate-income homeseekers." *Id.* "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests" *Id.* The Supreme Court distinguished such concrete harms from cases like *Sierra Club*, in which the organizational plaintiff had alleged nothing more than a "mere interest in a problem." *Sierra Club*, 405 U.S. at 739 (internal quotation mark omitted). With no concrete injury alleged other than to its abstract social interests, CAIR-AZ's claims were properly dismissed for lack of standing.

### 2. CAIR-AZ did not "divert" its resources; it simply spent resources on preferred activities consistent with its general mission.

Second, Appellants failed to properly allege diversion of resources under *Havens*. In order to assert standing on its own behalf under *Havens*, an organization is required to allege "(1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [injurious behavior] in question." *Rodriguez*

*v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019) (citation omitted). Vaguely alleging diversion of resources, however, does not suffice. Instead, the organization must specifically allege that the diversion of resources was from "other activities that would advance its mission" and must be something more than "merely going about its business as usual." *See id.*; *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1155 (9th Cir. 2019). Thus, an organization may not assert standing without first "explain[ing] what activities the [organizations] would divert resources away *from* in order to spend additional resources on combatting the" alleged injury. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020) (remanding to district court with instructions to dismiss for lack of jurisdiction); *see also Animal Legal Def. Fund v. Kelly*, 434 F. Supp. 3d 974, 996 (D. Kan. 2020), *amended*, CV 18-2657-KHV, 2020 WL 1659855 (D. Kan. Apr. 3, 2020) ("[T]he purported injury to [the organization plaintiff] is not sufficiently distinct from its general mission" to confer standing based on diversion of resources.").

As reflected in the Complaint, CAIR-AZ is a non-profit organization engaged in "correcting" what it considers "Islamophobic information" and "advocacy and protecting the civil rights of American Muslims while promoting justice." ER-49. The only injury CAIR-AZ alleges in the Complaint is diversion of "resources to create a campaign correcting the Islamophobic information." ER-187 ¶ 63. Even if true, this vague allegation cannot confer standing because "[a]ny resources that

[CAIR-AZ] expended on [the public relations campaign] were in the normal course of [CAIR-AZ's stated] operations." *Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, 42 F. Supp. 3d 125, 132 (D.D.C. 2014). CAIR-AZ therefore "cannot convert its ordinary activities and expenditures related to [those activities] into an injury-in-fact." *Id.*

This Court's decision in *Rodriguez v. City of San Jose* is instructive. There, organizations claimed standing to assert Second Amendment challenges to the confiscation and retention of an individual's guns. 930 F.3d at 1135. The gun owner was not a member of the organizations, and the organizations did not assert any "injury to their members." *Id.* And while the organizations alleged that "they expend[ed] resources advising and assisting members and non-members in navigating California's gun laws and attempting to recover confiscated firearms," they failed to allege "any evidence of expending resources to assist [the gun owner] apart from incurring litigation costs as co-plaintiffs in her federal litigation." *Id.* at 1136. With no direct connection to the gun owner plaintiff and no clear explanation of how "the confiscation and retention of [the gun owner's] guns frustrates their missions or require[d] them to divert resources," this Court held the organizations lacked standing. *Id.*

Like the organizations in *Rodriguez*, CAIR-AZ is not asserting claims on behalf of its members. Similarly, CAIR-AZ has not explained how the alleged

violation of Mr. Sabra's constitutional rights "impedes their ability to carry out their mission or requires them to divert substantial resources away from the organizations' preferred uses – let alone both." *Id.* at 1135. Indeed, the only alleged diversion of resources, for the public relations campaign, was directly to CAIR-AZ's stated preferred uses of resources for "correcting" what it considers "Islamophobic information" and "advocacy and protecting the civil rights of American Muslims while promoting justice." ER-49.

### 3. *Havens* does not confer standing where, as here, CAIR-AZ is engaging in pure issue advocacy.

Third, courts have consistently held that even diversion of resources cannot establish standing when the activities from which resources were diverted are "pure issue-advocacy." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005) ("Here, the only "service" impaired is pure issue-advocacy-the very type of activity distinguished by *Havens*."); *Young Advocates*, 359 F. Supp. 3d at 232 ("[C]ourts have been reluctant to extend this [organizational standing] doctrine to organizations engaged primarily in social advocacy."); *Resident Councils of Wash. v. Thompson*, C04-1691Z, 2005 WL 1027123, at *7 (W.D. Wash. May 2, 2005) ("Although Plaintiffs allege that the organization has devoted resources towards assisting in developing [a] program [directed at addressing the harm it alleges], these activities amount to mere issue advocacy, rather than harm to the organization's ability to offer services to its members."); *We Are Am./Somos Am., Coal. v.*

*Maricopa Cty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1101 (D. Ariz. 2011) (no organizational standing for a plaintiff that "sweepingly allege[d] that 'its primary goals include promoting and protecting the legal, political, social, and cultural interests of Latinos in the United States'" because "the complaint's allegations as to [the organization] amount to nothing more than 'simply a setback to [its] abstract societal interests'") (citation omitted); *Mecinas v. Hobbs*, 468 F. Supp. 3d 1186, 1204 (D. Ariz. 2020) (no organizational standing, based on abstract social interests of "electing Democrats in Arizona"); *Project Sentinel v. Evergreen Ridge Apts.*, 40 F. Supp. 2d 1136, 1139 (N.D. Cal. 1999) (no organizational standing; complaint "alleges nothing more than a setback to the organization's abstract social interest in gaining compliance with fair housing laws" and did not allege, e.g., that "it provides any service or is engaged in any other enterprise independent of this action that might be frustrated by defendants' allegedly unlawful conduct").

The only activities CAIR-AZ alleges are pure issue advocacy. CAIR-AZ does not distinguish its anti-Islamophobia advocacy from the various forms of issue advocacy courts have found insufficient to confer standing. The court in *Young Advocates* rejected a similar organizational standing theory for an Establishment Clause claim. In *Young Advocates*, an organization sought to raise a challenge to a New York statute and related regulations, purportedly allowing private Hasidic Orthodox Jewish schools an exemption, subject to agency discretion, from providing

41

the same quality of education as their secular counterparts. 359 F. Supp. 3d at 230. The organization's stated purpose was to advocate for the improvement of "secular education in the Orthodox Jewish community, in particular in the Hasidic community." *Id.* Before the statute was passed, the organization was involved in "lobbying State and local officials for greater oversight, direct outreach aimed at the Hasidic community, and educating the larger public about the issue" as well as other related activities. *Id.* Despite an allegation that the organization had "shift[ed] valuable efforts away from its traditional advocacy and educational efforts" to challenge the statute, the court rejected the organization's assertion of standing as based in pure issue advocacy. *Id*. at 231.

As the court explained, if it "were to accept [the organization's] argument, it would be difficult to conceive of a case in which an organization or individual would *not* have standing to challenge a statute that they find politically or socially disagreeable." *Id*. Further, "[i]f any plaintiff with a strong objection to a statute could manufacture standing by spending time and money opposing that very statute—and then arguing that the expenditure of that time and money was itself an injury—there would be no real constraint upon standing at all, except perhaps the size of the plaintiff's bank account." *Id.*

Consistent with *Young Advocates* and the other cases cited above, allowing CAIR-AZ to assert standing based only on its strong objection to the content of Dr.

Damask's World Politics course and its spending of time and money opposing its understanding of course content through a public relations campaign would erase any real constraint on standing in Establishment Clause cases. Organizational standing to challenge the content of a college course requires something more than a public relations campaign directed at material that religious organizations find offensive. The district court was correct in dismissing CAIR-AZ's claims for lack of standing.

## III. This Court may also affirm dismissal because Appellants failed to identify an official policy giving rise to their alleged injuries.

Appellants lack standing and their claims are barred as a matter of law on the additional and independent ground that Appellants have not—and cannot—alleged an "official policy" to support their claims under 42 U.S.C. section 1983 ("Section 1983"). While the district court did not rule on this issue below, this Court may affirm the district court's decision on any ground. *See McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1096 (9th Cir. 2004) ("[W]e may affirm on any ground supported by the record . . . .").

### A. Respondeat superior liability does not apply to Section 1983 claims.

"A public college may not be held strictly liable [under Section 1983] for the acts of its non-policymaking employees under a *respondeat superior* theory." *Smith v. Odessa Junior Coll. Dist. Individually*, MO-11-CV-095, 2014 WL 12558000, at

*3 (W.D. Tex. Jan. 14, 2014) (citing *Okla. City v. Tuttle*, 471 U.S. 808, 817-18 (1985)). "Rather, only when the execution of a public college's policies or its customs deprives an individual of constitutional or federal rights, does liability under § 1983 result." *Id. (citation omitted).* Accordingly, to successfully plead a Section 1983 claim against MCCCD, Appellants must allege three elements: a policymaker; an "official policy"; and a violation of constitutional rights whose "moving force" is the policy or custom. *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978).

Courts have held that failure to sufficiently allege an official policy can also defeat standing. *See e.g.*, *Miller v. City of St. Paul*, 823 F.3d 503, 507 (8th Cir. 2016) (alleged restrictions on plaintiff's free speech rights stemmed from police commander's security plan—not a "final government policy" of the city; motion to dismiss granted); *An v. City of New York*, 230 F. Supp. 3d 224, 229 (S.D.N.Y. 2017) ("The official policy requirement for a plaintiff to have standing is critical here.").

## B. The Complaint does not allege an "official policy" that could support Section 1983 liability against MCCCD.

Appellants failed to allege any official policy giving rise to their claims against MCCCD, which are all based on Dr. Damask's course content. The only arguable "policy" Appellants cite in their complaint—MCCCD Regulation 3.6—neither contemplates nor requires any substantive review or approval by MCCCD of the specific content of Dr. Damask's course. Regulation 3.6 states only:

The instructor must present a course syllabus to students during the first week of a class (before the end of drop/add). A copy of the course syllabus must be submitted to the division/department office at the college no later than the end of the first week of class.

ER-52.

If substantive review and approval were contemplated, such review/approval would happen before the course began, not at "the end of the first week of class." Moreover, the information provided in the syllabus on the module on terrorism states only that the topic of "Islamic Terrorism" will be covered. Nothing in this brief syllabus description would flag or suggests to MCCCD any alleged inappropriate content. On the contrary, as Appellants readily conceded in their Complaint: the syllabus "does not state that it includes instruction based on one-sided, biased perspectives of Islam or that it excludes other ideologies of Islam." ER-178–79 ¶ 7.

The only other action by MCCCD showing direct involvement was the statement on academic freedom issued *after* Mr. Sabra completed the course. Because there is no allegation that MCCCD knew of the content of Dr. Damask's course "before the alleged constitutional violations ceased," no ratification by MCCCD could have contributed to Appellants' claims. *See Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) ([R]atification requires, among other things, [prior] knowledge of the alleged constitutional violation."). Accordingly, as a matter of law, Appellants lack standing and have failed to allege a sufficient claim under Section

1983 as well. The district court's dismissal should be upheld on this independent ground.

## IV. The district court correctly dismissed Mr. Sabra's First Amendment claims for failure to state a claim.

Mr. Sabra's First Amendment claims are also fatally deficient on the merits, as a matter of law. Mr. Sabra's claims are primarily an attempt to have this Court remove from the World Politics course material he considers religiously offensive and replace or modify it with a view of Islam more consistent with his own. The Complaint alternates between highlighting snippets from the course materials Mr. Sabra finds religiously offensive and explaining how a more sanitized version of the course could be created. The district court correctly rejected this attempt at judicial censorship of a college-level political science course as a matter of law.

### A. Standard of review and legal standard.

Courts may properly dispose of Establishment Clause and Free Exercise claims at the motion to dismiss stage. *E.g., Parker v. Hurley*, 514 F.3d 87, 107 (1st Cir. 2008) (affirming dismissal of Establishment Clause and Free Exercise Clause claims); *Freedom from Religion Found. v. Hanover Sch. Dist.*, 626 F.3d 1, 15 (1st Cir. 2010) (same); *Bauchman v. W. High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997) (same). Indeed, the Ninth Circuit has held that "it is appropriate to test the viability of [a plaintiff's] claim under *Lemon*, even at th[e] early stage" of a Rule 12(b)(6) motion. *See e.g.*, *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1255 (9th Cir. 2007);

46

*Am. Family Ass'n. Inc., v. City & Cty. of S.F.*, 277 F.3d 1114, 1121-22 (9th Cir. 2002). In doing so, courts are not "required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (citation omitted).

### B.     Mr. Sabra failed to state an Establishment Clause claim.

Government action satisfies the Establishment Clause if it: (1) has a secular purpose; (2) does not have the principle or primary effect of advancing or inhibiting religion; and (3) does not foster excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971); *Catholic League*, 624 F.3d at 1054-55(holding that "*Lemon v. Kurtzman* remains controlling on Establishment Clause [alleged] violations, subject to subsequent emendations as the 'endorsement' and 'neutrality' principles have developed.").

Appellants do not dispute the first and third *Lemon* elements. Appellants instead assert that the course content fails the second prong of the *Lemon* test because it allegedly "disapprov[es]" of Islam. ER-187 ¶ 69. But, "[t]here has never been any reported case holding that a teacher violate[s] the Establishment Clause by making statements in the classroom that were allegedly hostile to religion." *Farnan*, 654 F.3d at 986. Even accepting as true the allegations in the Complaint that are not

contradicted by the documents referenced in or relied upon in the Complaint, the district court correctly concluded that Appellants claims cannot survive as a matter of law.

>    1.    **The primary effect standard requires an informed and objective observer and does not categorically prohibit all disapproval of religion.**

As a fundamental matter, Appellants cite no authority to suggest that teaching anything other than the purported "mainstream" views of a religion, or not specifically calling out conflicting viewpoints on a religious practice or doctrine in a college class about politics, constitutes "disapproval" of a religion. Moreover, as Dr. Damask explained to Mr. Sabra: the course content "isn't 'for' or 'against' anything, but aims to explain international politics." ER-239. The fact that the content may not correspond with Appellants' views of Islam does not mean that the course, Dr. Damask, or MCCCD "disapproves" of Islam.

Regardless, "public schools are not required to delete from the curriculum all materials that may offend any religious sensibility." *Florey v. Sioux Falls Sch. Dist.*, 619 F.2d 1311, 1318 (8th Cir. 1980); *id.* at 1317 ("It would be literally impossible to develop a public school curriculum that did not in some way affect the religious . . . sensibilities of some of the students or their parents."). Consistent with this practical recognition, *Lemon*'s second prong affirms that governmental action is

constitutional unless it has the "*principal or primary* effect . . . [of] advanc[ing] nor inhibit[ing] religion." *Lemon*, 403 U.S. at 612 (emphasis added).

Moreover, the primary effect of a challenged practice is not a subjective analysis, but is considered under a "reasonable observer standard," where the hypothetical observer is both "informed" and "reasonable," and "we assume that he or she is familiar with the history of the government practice at issue." *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1378 (9th Cir. 1994) (citation omitted); *id.* at 1379 ("If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself or herself."). In addition, "when determining the purpose or primary effect of challenged religious content, courts . . . consistently have examined the entire context surrounding the challenged practice, rather than only reviewing the contested portion." *Wood v. Arnold*, 915 F.3d 308, 314 (4th Cir. 2019) (noting that "context is crucial" and also dictated by "common sense"); *Cal. Parents for Equalization of Educ. Materials v. Torlakson*, 370 F. Supp. 3d 1057, 1081 (N.D. Cal. 2019) ("context . . . [is] essential in assessing the primary effect"). Appellants' argument (at 20-21) that the Court must put on blinders and must consider the challenged module devoid of the course context, is simply wrong.

Accordingly, the district court properly viewed Appellants' claims in context and under the objective, reasonable observer standard, which would acknowledge and understand: (1) the module's focus is "Islamic Terrorism"—not "mainstream Islamic beliefs" or "Islam generally"; (2) the course is a political science course, focused on international politics—not a religion course, focused on intra-faith disputes within Islam about various doctrinal interpretations; (3) the slides focus on analyzing Islamic texts, traditions, and legal doctrines by which terrorist organizations justify their actions, including the statement that "*[a]ll* Islamic terrorists sanctify their actions through pious references to the Quran and the traditions of the Prophet Muhammad"; (4) the course discusses scholars' views that "radical terror groups such as al Qaeda that represent a 'twisted' variant of Islam as a whole"; (5) the course discusses scholars' views that "[t]errorism & jihad are being undertaken by forces of reaction within the Islamic world attempting to revive the Caliphate"; and (6) the module discusses several other examples of religious and non-religious groups engaging in terrorism as a means of achieving political objectives. (ER-129, -141, -145.) This context was further validated in Mr. Sabra's email exchanges with Dr. Damask, confirming that the focus is on "explain[ing] international politics" and "what beliefs motivate [terrorist organization] no matter how wrong they may be." (ER-237, -238, -241.)

In addition to considering context, under the objective reasonable-observer standard, even where the government practice reflects "some disapproval" of religion, this alone is not enough to run afoul of the Establishment Clause. *Torlakson*, 370 F.Supp.3d at 1079 ("[E]ven if there is some evidence by which a reasonable person could infer a disapproval of Hindu religious beliefs . . ., that is not enough to conclude that the primary message . . . is disparagement."); *id.* at 1081 (affirming that plaintiff's interpretation of *Lemon*'s second prong "would read the word 'primary' out of the primary effect test and render any conceivable disapproval a constitutional violation. That is not the law.").

> ## 2. Sabra failed to sufficiently allege Dr. Damask's course materials had the primary effect of advancing or inhibiting religion.

The PowerPoint lecture, incorporated by reference into Appellants' Complaint, provides the specific context for its discussion of Islam at Slide 25: "*All* Islamic terrorists sanctify their actions through pious references to the Quran and the traditions of the Prophet Muhammad, and by extensive use of longstanding Islamic legal doctrines." ER-129. Thus, when Slide 25 theorizes in the next paragraph a connection between (1) Islamic jurisprudence and religious texts and (2) support for warfare and violence, it does so from the perspective of those seeking to justify violent acts in the name of Islam:

> Contentions that Islam does not promote warfare or violence cannot be supported on either theological or historical grounds - indeed, such

contentions would flatly contradict hundreds of Quranic passages and *hadiths* ("traditions") of Muhammad, as well as longstanding Islamic jurisprudence.

ER-129.

When read in context, this statement is neither facially nor impliedly a condemnation of Islam. A cursory search would undoubtedly reveal numerous scholarly articles theorizing that every major world religion has promoted warfare or violence in reliance on religious texts at some point in its history. In fact, a statement in a college course or scholarly article that Islam (or any religion) has never promoted violence or warfare would probably be much closer to endorsing a religion than this statement by Dr. Damask gets to condemning one.

Similarly, Slide 23 discusses the "theological mandate for jihad" but clearly does so from the perspective of terrorists seeking justification for their actions. ER-127. In describing the "efforts" required in jihad, Slide 22 states that they are "physical, not simply prayer or introspection." ER-126. Notably, the statement does not preclude prayer and introspection or any other kind of spiritual or emotional struggle. Moreover, there are many forms of physical action that do not involve terrorism, including potentially self-defense or actual warfare. Thus, when Slide 22 goes on to state that "jihad is a religiously-justified, communal mobilization of the resources and capabilities of the Muslim population for war against unbelievers," it is decidedly not stating that the Muslim population generally condones terrorism.

ER-126. It is simply explaining the justifications offered by those in Islam who do support terrorism.

Other slides in the "Islamic Terrorism: Definition" section make broad statements regarding support of terrorism or specific acts of terrorism by Islamic legal authorities. Yet it is clear from context that statements about "nearly every Islamic legal authority of any significance" or "unanimous" legal support for terrorism or terrorist acts refer to sources terrorists would consider authoritative. ER-132; ER-137. While dissenting views obviously exist, terrorists would not rely on them. They are therefore not discussed in, or particularly relevant to, the presentation.

A reasonable and informed objective observer, in the context of a politics class studying terrorism motivated by Islamic ideologies, would view the materials as having the primary effect of providing an analysis of the Islamic texts, traditions, and legal doctrines by which terrorist organizations justify their actions.

Contrary to Appellants' repeated refrain throughout their brief (at, e.g., Opening Br. at 2, 9, 12-13, 39–41) and Complaint (at, e.g., ER-185, -187), nowhere in any of the course materials is it ever stated that "Islam mandates terrorism," "Muslims have a 'theological mandate' to kill Non-Muslims," or that "Islam is terrorism." To reach the conclusions Appellants draw, a narrow focus on decontextualized statements is necessary, as the district court properly held.

In sum, none of Appellants' allegations, when considered in the context of the materials they reference, supports a conclusion that the primary effect of Dr. Damask's World Politics course materials advanced or disapproved of religion. The district court therefore correctly dismissed their Establishment Clause claim. *See e.g.*, *Am. Family Ass'n.*, 277 F.3d at 1118-22 (upholding dismissal under Rule 12 (b)(6) of Establishment Clause claim brought against a resolution condemning a series of anti-gay advertisements religious groups had placed in newspapers because "read in context as a whole, [the resolution was] primarily geared toward promoting equality for gays and discouraging violence against them"); *Vasquez*, 487 F.3d at 1257 (upholding dismissal under Rule 12(b)(6) of Establishment Clause hostility claim).

Finally, Appellants' extensive reliance on *Vernon v. City of Los Angeles*, 27 F.3d 1385 (9th Cir. 1994) reveals their position's lack of substance. *Vernon* involved an officer who was investigated for on-duty activity after an article on his religious views, or those ascribed to him, was published. This Court rejected the argument made by the plaintiff that just because "one may infer possible city disapproval of [the officer's] religious beliefs from the direction of the investigation, this cannot objectively be construed as the primary focus or effect of the investigation." *Id.* at 1398–99. Although *Vernon* was decided at summary judgment, nothing in *Vernon* suggested that a case appropriately ripe for dismissal earlier must be decided at

summary judgment. If any analogy can be made from *Vernon*, it is that even if some general disapproval of Islam could be inferred from Dr. Damask's Islamic Terrorism module, "this cannot objectively be construed as the primary focus or effect" of the module or the World Politics course. *See id.* Rather, like the investigation in *Vernon*, the primary focus of the module and course were benign: instruction on World Politics matters, including international terrorism among those who profess belief in Islam. Any purported disapproval of Islam would be incidental at most and not the primary focus or effect of the course content.

### 3. The few cases addressing Establishment Clause challenges to college or advanced secondary course content universally reject arguments based on alleged religious offense.

In *Gheta v. Nassau County Community College*, the court considered claims by students challenging course materials in a human sexuality course that "contain[ed] passages antithetical to plaintiffs' religious beliefs." 33 F. Supp. 2d at 185. After examining the course materials "as a whole," including by analyzing course syllabi, the court noted that "[w]hen religion is mentioned, it is discussed from an historical, descriptive perspective, and the authors include citations to the reference materials on which they rely." *Id.* "Other references recognize that religious beliefs form one basis for individuals' attitudes toward sexual behavior." *Id.*

55

Viewing the evidence in the light most favorable to the plaintiffs, the court held that the "materials as a whole are designed to teach students about human sexuality as an academic subject, and not about religion," and "[t]he references to religion have the effect of providing an historical and social context for the discussion on human sexuality and do not either indoctrinate students in a particular religion or disparage a particular religion or all religions." *Id.*

Similar to the course in *Gheta*, the references in the World Politics course to religion provide the "historical and social context for the discussion on [international terrorism] and do not either indoctrinate students in a particular religion or disparage a particular religion." *Id.*

*In Farnan v. Capistrano Unified School District*, this Court dismissed on qualified immunity grounds an Establishment Clause challenge to an advanced placement history course based on statements a student found religiously offensive. 654 F.3d at 988. While the Court did not address the Establishment Clause claim directly, it observed that "there has never been any reported case holding that a teacher violated the Establishment Clause by making statements in the classroom that were allegedly hostile to religion." *Id.* at 986. While noting the need for teachers in the K-12 context to be "be sensitive to students' personal beliefs and take care not to abuse their positions of authority," the Court emphasized that "teachers must also be given leeway to challenge students to foster critical thinking skills and develop

their analytical abilities." *Id.* at 988. The Court cautioned against "curb[ing] intellectual freedom by imposing dogmatic restrictions that chill teachers from adopting the pedagogical methods they believe are most effective." *Id.* These principles are even more important in the post-secondary context.

Like the teacher in *Farnan*, Dr. Damask must be given discretion to foster critical and analytical thinking skills, even when the subject matter is controversial or touches on religious topics that students like Mr. Sabra may find offensive. "That a college student may disagree on religious grounds with the perspective offered by her teacher or textbook does not amount to a violation of the First Amendment." *Gheta*, 33 F. Supp. 2d at 187.

### 4. The relief sought by Appellants would itself result in a violation of the Establishment Clause.

Appellants' brief and the Complaint focus on the alleged "Islamophobic" nature of the course materials and "counter-arguments or opposing viewpoints" that Appellants believe are necessary to ensure the course does not cross the line into Islamophobia. Opening Br. at 3-5, 31, 37; ER-180 ¶ 17. For example, while the Complaint implicitly acknowledges that Islamic religious texts referenced in the course are translated as "terrorize" and "terror," Appellants nevertheless claim these translations are wrong because "many translations of these verses by actual scholars do not even use the words 'terrorize' or 'terror.'" ER-181 ¶ 23. The Complaint states that "more acceptable and in fact, mainstream views of 'jihad'" should have been

used. ER-183 ¶ 34. The Complaint asserts and suggest that Dr. Damask was obligated to agree and point out to students that Walid Phares espouses "anti-Muslim ideologies" and presents "an extreme perspective." ER-183 ¶ 35–36. The Complaint even engages in the type of rhetoric it otherwise condemns by including potentially offensive statements about other religions Appellants consider necessary to appropriately discuss the concept of terrorism, noting: "It is an unquestionable fact that the Ku Klux Klan espoused Protestant Christian ideologies to wage terror in the United States in an attempt to create their own nation-state, and even believed that Jesus was the first Klansman." ER-180 ¶ 15.

These and other requests to edit course content, if granted, threaten not only to turn the federal courts into an academic curriculum review committee, but "would [themselves] result in a violation of the Establishment Clause." *Gheta*, 33 F. Supp. 2d at 187; *see also Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (noting that courts are "categorically prohibit[ed]" from resolving religious questions). "Allowing religious groups [like CAIR-AZ] to dictate the curriculum of a public college would have the direct and obvious effect of endorsing those groups' religious views." *Gheta*, 33 F. Supp. 2d at 187.

"In addition, assuming that only those materials expressly found objectionable by [CAIR-AZ] were to be considered, the school would become involved in deciding which statements are offensive to plaintiffs' religious views and which they approve.

Such an enterprise would be a paradigm of improper entanglement." *Id.; see also Brown*, 27 F.3d at 1379 ("If an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the lowest common denominator, permitting each student to become a 'curriculum review committee' unto himself or herself.").

### C.   Mr. Sabra failed to state a Free Exercise claim.

Mr. Sabra's Free Exercise claim fails because (1) he fails to allege a substantial burden on his religious practice and (2) even if his practice were burdened, the state's interest in providing a robust education outweighs that burden.

### 1.   Mr. Sabra failed to allege a substantial burden on his religious practice.

As with their Establishment Clause claim, the district court properly concluded that Appellants failed to state a Free Exercise claim because they do not sufficiently allege that any of Appellees' actions "substantially burden[ed] a religious practice." *Am. Family*, 277 F.3d at 1123; *see also Parker*, 514 F.3d 87; *Cal. Parents for Equalization of Educ. Materials v. Torlakson*, 267 F. Supp. 3d 1218, 1226 (N.D. Cal. 2017).

Appellants assert that Mr. Sabra was "forced to choose between denouncing his religious beliefs and accepting a lower score for the quiz" associated with the Islamic Terrorism module. (Opening Br. at 4, 7.) But Mr. Sabra was not being asked to adopt the correct answer on a quiz about terrorism founded on Islamic beliefs as

his own, personal religious view; Mr. Sabra was being tested to "demonstrate understanding" of the course material—something courts have held is not a violation of the Free Exercise Clause. *See Wood*, 915 F.3d at 312-13; 319 (rejecting student's Free Exercise claim that he was academically punished for refusing to complete a fill-in-the-blank quiz on Islam indicating that "There is no god but ____ [Allah] and Muhammad is the ___ [messenger]," in contravention of his Christian religious beliefs; the quiz did not require the student to "profess or accept the tenets of Islam," but rather "to demonstrate her understanding of the world history curriculum"); *see also Cal. Parents*, 267 F. Supp. 3d at 1225 (school curriculum, allegedly requiring students to learn a "derogatory depiction" of Hinduism, does not violate the Free Exercise Clause; motion to dismiss granted); *Parker*, 514 F.3d at 99 (no burden on religious exercise when students read a book plaintiffs found religiously offensive; dismissal affirmed).

The fact that the material in the World Politics course was apparently offensive to Mr. Sabra does not provide the basis for a Free Exercise challenge. *Am. Family*, 277 F.3d at 1124 (upholding dismissal of Free Exercise claim where plaintiffs failed to sufficiently allege a substantial burden on practicing their religion); *Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002) (student may be required to write a paper from a particular viewpoint, even if the student disagrees with that viewpoint); *Lee v. Weisman*, 505 U.S. 577, 597 (1992) (noting that it is an inevitable

fact that "[p]eople may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation.").

Mr. Sabra had every opportunity to develop his own views and engage in his own practice of Islam regardless of anything taught by Dr. Damask. As courts have consistently recognized for elementary and secondary schools, even if allegedly religiously offensive material is being taught, "the mere fact that a child is exposed on occasion in public school to a concept offensive to a parent's religious belief does not inhibit the parent from instructing the child differently." *Parker*, 514 F.3d at 105; *Cal. Parents*, 267 F. Supp. 3d at 1226 ("Nor are there allegations that student Plaintiffs are prevented from practicing their faith, or that parent Plaintiffs are in any way barred from instructing their children on religion at home."). College students presumably have even greater opportunities to seek religious or other edification from various sources outside the classroom, if they so choose.

### 2. MCCCD has a compelling interest in ensuring a robust education that challenges students' preconceived ideas.

When confronted with similar challenges, courts have long held that "the government's interest in providing a well-rounded education would be critically impeded by" giving in to requests to censor course content. *See Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 690 (7th Cir. 1994) ("Even if we were to find that the parents' free exercise rights were somehow substantially burdened, we would find that the government interest outweighed such a burden."); *McCollum v.*

*Bd. of Educ.*, 333 U.S. 203, 235 (1948) (Jackson, J. concurring) ("If we are to eliminate everything that is objectionable to any [religious group] or inconsistent with any of their doctrines, we will leave public schools in shreds. Nothing but educational confusion and a discrediting of the public school system can result from subjecting it to constant law suits.").

Mr. Sabra has not only failed to allege a burden on his religious practice, he has failed to explain why any burden is not outweighed by MCCCD's interest in academic freedom and debate for its students. *See e.g.*, *infra,* discussion of academic freedom; *Rodriguez*, 605 F.3d at 708-09; *Farnan*, 654 F.3d at 988.

## V.    The district court correctly dismissed the claims against Dr. Damask under qualified immunity.

The district court correctly dismissed claims against Dr. Damask on qualified immunity grounds.  As this Court has recognized, there are no cases holding that content critical of religion in a college course violates the Establishment Clause. *Farnan*, 654 F.3d at 987 (noting that existing caselaw finding violations of the Establishment Clause in the "educational context involve claims that school officials were *promoting* religion rather than expressing hostility toward it, and challenge *systemic* actions such as state laws and school district policies rather than parsing individual teachers' classroom discussions").  MCCCD adopts and incorporates Appellee Damask's further arguments and analysis on this issue in its separate Answering Brief.

## CONCLUSION

The district court correctly dismissed Appellants' claims under Rules 12(b)(1) and 12(b)(6).  CAIR-AZ's generalized grievance does not provide it standing; the absence of an official policy endorsing Dr. Damask precludes Section 1983 liability against MCCCD; Mr. Sabra's being personally offended is not sufficient to support an Establishment Clause claim, particularly given academic freedom considerations; requiring Mr. Sabra to demonstrate understanding does not violate Free Exercise protections; and Dr Damask is entitled to qualified immunity as a matter of law. Accordingly, this Court should affirm the district court's decision in its entirety.

RESPECTFULLY SUBMITTED this 21st day of May, 2021.

OSBORN MALEDON, P.A.


By s/ David D. Garner
    David D. Garner
    Travis C. Hunt
    2929 North Central Avenue, Suite 2100
    Phoenix, Arizona  85012

**Attorneys for Defendant-Appellee
Maricopa County Community College
District**

# STATEMENT OF RELATED CASES

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)**

The undersigned attorney or self-represented party states the following:

☒  I am unaware of any related cases currently pending in this court.

☐  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

☐  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ David D. Garner **Date** May 21, 2021
*(use "s/[typed name]" to sign electronically-filed documents)*

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains 12,174 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☒ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties;
    ☐ a party or parties are filing a single brief in response to multiple briefs; or
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/ David D. Garner_____ **Date** May 21, 2021
*(use "s/[typed name]" to sign electronically-filed documents)*